IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABF FREIGHT SYSTEMS, INC., THOMAS MILLS, | No. C 10-05188 SI, consolidated with 11-04663 |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR DETERMINATION OF GOOD FAITH SETTLEMENT** |
| v. | |
| UNITED STATES OF AMERICA, SECURITY CONSULTANT'S GROUP, INC., WEST BAY BUILDERS, INC., and DALEY'S DRYWALL, | |
| Defendants. | |

Currently before the Court is a motion by defendants West Bay Builders, Inc. and Daley's Drywall for determination of good faith settlement. Co-defendants Security Consultants Group, Inc. and the United States of America have filed oppositions to the motion, to which the moving defendants have replied. On March 1, 2013, the Court held a hearing on the motion. Having considered the parties' arguments, the Court hereby GRANTS defendants' motion for the reasons set forth below.

**BACKGROUND**

Plaintiff ABF Freight Systems, Inc. ("ABF") employed plaintiff Thomas Mills as a driver. On December 12, 2008, acting within the scope of his employment, Mills was picking up and dropping off materials at the Department of Homeland Security facility located at 630 Sansome Street, San Francisco, California. Upon exiting an elevator in the facility's loading dock while hauling a 1,800-pound pallet, Mills slipped and fell on an allegedly wet surface, injuring himself.

These consolidated lawsuits followed. Defendant USA owned the facility and contracted with defendant Security Consultants Group ("SCG") to provide security for the facility, including the loading dock area. Defendant West Bay Builders ("WBB") was performing construction work on the facility,

and it hired defendant Daley's Drywall to perform drywall work at the facility. On November 16, 2010, plaintiff ABF filed suit under the Federal Tort Claims Act seeking $200,000 in reimbursement for past and future workers' compensation benefits paid to, or on behalf of Mills as a result of the injury. On September 20, 2011, plaintiff Mills filed an action (Case No. 11-4663) under the Federal Tort Claims Act alleging negligence against the USA. The cases were consolidated and on April 5, 2012, Mills filed an amended complaint alleging negligence against all four defendants for damages in excess of $3,000,000.

**1.    December 2008 Incident**

Upon arriving at the facility's loading dock at approximately 2:15 p.m., Mills checked in with security guard Kwame Ankra, an employee of defendant SCG. Also present at the facility that day were four or five WBB employees and five or six Daley employees. Mills brought with him a pallet jack in order to pick up four 1,800-pound pallets from the 13th floor of the facility. The pallet jack was a "tricycle" type, with two blades with wheels going out and the handle going up. It had no brakes.

After checking in, Mills proceeded with his pallet jack up the yellow loading dock ramp – a metal ramp with a raised diamond pattern approximately 10-12 feet long and ascending 5 feet high toward the elevator. Mills retrieved the first three 1,800-pound pallets from the 13th floor without incident. During those trips he noticed no hazards on the ramp, including no water. Mills believes that unbeknownst to him, the ramp was washed between his third and fourth trips. On his fourth trip, Mills fell and injured himself as he was attempting to maneuver the pallet jack over the lip of the ramp. Mills alleges that he slipped because the ramp was slippery and that there were no cones or signs warning him to take caution due to that danger.

SCG employee Ankra witnessed Mills' fall shortly after 2:30 p.m. Ankra arrived at his post at 2 p.m., and took over for Oscar Hernandez. At his deposition, Ankra acknowledged that the ramp was wet but did not believe his duties required him to put up any warning cones or issue any warning. Ankra testified that Hernandez told him the ramp had been washed, but did not identify who washed the area,

other than to say that there were four or five construction workers around. At his own deposition, however, Oscar Hernandez testified that as his shift ended, he noticed WBB employees preparing to wash down the ramp area. At no time did he actually see any water being sprayed. Before his shift ended, Hernandez recalls telling Ankra that construction workers were going to wash down the area and to make sure that he put warning cones up.

After the fall, Ankra assisted Mills and called for medical assistance. Melanie Vero, an employee of the General Services Administration ("GSA"), which operates the federal facility at 630 Sansome, also responded to the scene at approximately 3 p.m. Vero is the "Building Management Specialist," a position which requires that she investigate and report such incidents. She spoke to Ankra and Mills and surveyed the scene, observing that the ramp was damp to the touch and that the upper loading dock area was visibly wet. She asked Ankra why the ramp and loading dock were wet, and he told her that it had been washed down, based on what he says Hernandez told him. Vero never spoke to Hernandez. Vero completed an accident report in which she wrote that WBB employees washed down the ramp. However, her account was based on second hand knowledge; Vero's supervisor David Johnson told her that WBB was responsible for washing down the area and so she assumed that WBB *actually* washed the area.

Mike Gram was WBB's superintendent for the construction work being done at the facility. He testified that in general, WBB knew that USA wanted it to wash down the ramp and loading dock throughout the day as debris accumulated. He testified that this was imparted to their subcontractor Daley. However, both WBB and Daley deny having washed down the ramp and loading dock area at the time of the incident.

**2. Contractual relationships among defendants**

SCG entered into a contract with USA to provide security services at 630 Sansome. The contact provides that SCG will provide armed guards and that, "[i]n accordance with the procedures in the Post Orders, security guards shall immediately report all potentially hazardous conditions and items in need

3

of repair, including inoperative lights, locks, security hardware, leaky faucets, toilet stoppages, broken or slippery floor surfaces, locked emergency routes or exits, etc." Adams Decl., Ex. H.

WBB and USA also entered into a contract by which WBB was required to carry certain minimum coverages for worker's compensation and employer's liability insurance, general liability insurance, and automobile liability insurance. The contract required WBB to name as an additional insured on those policies "the United States of America, acting by and through the General Services Administration." Tseng Decl., Ex. A. WBB has not yet confirmed to USA whether WBB properly added USA as an additional insured under WBB insurance policy with Arch Insurance. Tseng Decl., Exs. C, D. However, WBB's general liability policy with Arch Insurance provides in relevant part:

> Section II – Who is an "Insured" is amended to include as an insured any person or organization for whom you are performing operations when you are specifically required by a written construction contract or agreement with such person or organization to include them as an additional insured on your policy and provide coverage for such additional insured only for liability arising out of:
>
> i)   "your work" at the location designated; or
> ii)  The "products completed operations hazard."
>
> Coverage afforded to these additional insured parties will be primary and any other insurance available to these parties will not be called upon to contribute.

Tseng Decl. Ex. E.[1] The USA contends that this provision suffices to qualify it as an additional insured. Accordingly, the USA tendered its defense to Arch Insurance via letter dated February 20, 2013.

### 3. Settlement

On February 5, 2013, all parties engaged in a daylong mediation session, which produced a settlement between plaintiffs and WBB and Daley's. It did not produce a settlement between plaintiffs

---

[1] WBB objects to the Court's consideration of the Arch Insurance Policy – calling it a "supposed contract" – on the grounds that it was not produced in discovery and that Mr. Tseng has no way of authenticating this document because he has no personal knowledge of the contract nor does he provide a declaration from anyone who entered into the contract. This objection is disingenuous. Mr. Tseng's declaration at ¶ 6 shows that he received the Arch Insurance Policy via email from WBB's counsel, Mr. Romeo. Accordingly, WBB's counsel cannot object to the authenticity of a document it produced to co-defendants in the first place. Moreover, as discussed later, the Court considers this Arch Insurance Policy only for the limited purpose of finding that it has no bearing on the issues presented in the instant motion.

4

and the USA and SCG. WBB agreed to pay $340,000 and Daley's agreed to pay $50,000 in exchange for plaintiffs dismissing their complaints, with prejudice, against WBB and Daley's, with each party to bear their own fees and costs. WBB and Daley's also agree to dismiss their cross-complaints against one another. ABF and Mills agreed that ABF would recover $107,500 from the settlement, and Mills would recover the remaining $282,500.

**DISCUSSION**

The moving defendants now seek a court order determining that the settlement agreement was entered by the parties in good faith and barring any present or potential joint tortfeasor from bringing any future claims against the settling defendants for equitable contribution or partial or comparative indemnity based on comparative negligence or comparative fault.

**1.    Legal Standard**

In a diversity case, the court applies federal law to procedural matters and the law of the state in which it sits to substantive matters. *See Erie Railroad Co v. Tompkins*, 304 U.S. 64, 78 (1938); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996). "The major substantive provision [governing good faith settlement under California law] is section 877" of the California Code of Civil Procedure. *Federal Savings and Loan Insurance Corp. v. Butler*, 904 F.2d 505, 511, (9th Cir. 1990). By contrast, "section 877.6 [of the code] is essentially a procedural statute." *Id*. Nonetheless, the Ninth Circuit has recognized that "the addition of section 877.6(c) did make a substantive modification by codifying a Supreme Court ruling that section 877 applied to partial or comparative indemnity as well as contribution." *Id*. at 511 n. 6. Although the remainder of section 877.6 is procedural, and therefore not binding on the court, the Ninth Circuit has determined that there is no federal procedural impediment to a district court's entertaining "a motion for an early determination of the good faith question," and so such a motion can be properly brought before the court. *Id*. at 511.

5

Under California law, "[w]here a release, dismissal with or without prejudice or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort…[i]t shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors." Cal. Civ. Pro. § 877. As a check on the validity of settlement agreements that might affect joint tortfeasors not parties to the settlement, California law further requires the court to make a determination that a settlement has been entered in good faith before that settlement can become final. *See* Cal. Civ. Pro. § 877.6. Section 877.6 allows a party to a proposed settlement to move the court for an order making such a determination. *See id.* That section provides further that "[a] determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." *See* Cal. Civ. Pro. § 877.6(c).

A good faith settlement is one within "the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." *Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.*, 38 Cal.3d 488, 499 (Cal 1985). To determine whether a proposed settlement fits that description, the court should consider: (1) a rough approximation of the settlor's proportionate liability; (2) the amount of the settlement; (3) the fact that a settlor should pay less in settlement that the amount of damages for which the settlor would be liable at trial; (4) the financial condition of the settling defendant and insurance policy limits, if any; (5) allocation of the settlement proceeds among the plaintiffs; and (6) the existence or absence of any collusion, fraud or tortious conduct aimed to injure the interests of any non-settling defendants. *Id*. at 499-500. The court assesses these factors "on the basis of the information available at the time of settlement." *Id.* at 499.

Ultimately, "a defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." *Torres v. Union Pacific R.R. Co*., 157 Cal.App.3d 499, 509 (1984). The court should approve even a contested settlement, unless there is a showing "that the settlement is so far out of the ballpark in

6

relation to these factors to be inconsistent with the equitable objectives of the statute." *Tech-Bilt*, 38 Cal.3d 499-500. The burden of proving that a settlement between the parties was not made in good faith is on the non-settling tortfeasor. Cal. Civ. Pro. § 877.6(d).

**2.      Security Consultant Group's Objections**

SCG raises several objections to the moving defendants' proposed settlement. First, as a threshold matter, SCG argues that the Court cannot even apply the *Tech-Bilt* factors here because there is not enough information to conduct that analysis. SCG contends that the facts gathered through discovery thus far show that WBB and Daley's "are the two parties who are most likely to have washed the loading dock and ramp on December 12, 2008 and failed to provide the warning to Mills that would have prevented his injuries." SCG Opp. at 8 (Docket No. 76). SCG asserts that allowing more discovery in this case will clarify that WBB and Daley's were responsible for washing the ramp. In particular, SCG believes that the deposition of David Johnson, Melodie Vero's supervisor, will clarify that WBB and Daley's were responsible for washing the incident site. Only with this more complete record, SCG contends, can the Court affix SCG's true liability.

The Court disagrees. First, California's good faith settlement law necessarily contemplates that cases will settle early, before the parties have expended time and money in lengthy discovery. *See Britz, Inc. v. Dow Chemical Co.*, 73 Cal.App.4th 177, 184 (1999) (one purpose of Cal. Civ. Pro. § 877.6 is "ease court congestion by providing an incentive to settle"). The only question for the Court is whether the information produced during discovery thus far is sufficient to *approximate* the settlor's liability. Here there is sufficient information to conclude that SCG had some role in the incident. In particular, SCG's employee Ankra testified that he did not warn or report the existence of the wet loading dock and ramp because he did not think it to be part of his job. However, SCG's contract with the USA specifically states that SCG employees are to report "broken or slippery floor surfaces," among other potential hazards. Adams Decl., Ex. H. While SCG contends that additional discovery will absolve it of liability, it is equally likely that additional discovery will increase SCG's liability by shedding light

7

on its duty – or failure to fulfil its duty – to warn Mills of the allegedly slippery area. Also, the additional deposition of David Johnson, which SCG contends will resolve the liability issues in the case, will likely have no such impact. Johnson is an employee of the USA, and he is not a percipient witness; his knowledge of the incident is third-hand (from Melodie Vero who learned of it from Mills and Ankra). His deposition cannot contradict the testimony of a percipient witness, Ankra, who testified that he made a decision not to warn or report the potentially hazardous condition. In any event, on a motion for a good faith settlement, the Court's job is not to perfectly apportion liability. Here, it cannot be said that there is not enough information to enable the Court to *approximate* liability for the limited purpose of determining whether the proposed settlement satisfies the good faith test.

SCG also objects to the proposed settlement because it is not supported by "substantial evidence" that it was reached in good faith. In SCG's view, the moving defendants' lone declaration from WBB's counsel Michael Romeo, is insufficient and further shows that the record is incomplete such that the Court cannot apply the good faith criteria. Here too, the Court disagrees. Mr. Romeo's declaration includes nearly 200 pages of evidentiary exhibits, including a copy of the proposed settlement and excerpts of several depositions. In addition, Romeo declares that the settlement was reached after conducting three depositions with plaintiff Mills, and six additional witness depositions and extensive written discovery. Romeo Decl. ¶ 5. The Court finds that the evidence submitted in connection with moving defendants' motion is sufficient to enable the Court to apply the *Tech-Bilt* factors.

Finally, SCG argues that the proposed settlement is not within the "ballpark" of WBB and Daley's share of liability because it is disproportionate both to the total recovery Mills seeks and it is disproportionate to SCG's contractual liability. The $390,000 settlement, according to SCG, is only 22% of Mills' potential overall recovery of nearly $2,000,000. In SCG's view, 22% is far less that WBB and Daley's proportionate liability, assuming they were the ones responsible for washing the ramp. While SCG guards are contractually required to report hazardous conditions, SCG notes that the contract is silent as to what constitutes a hazardous conditions. Thus, it may have been reasonable for

8

Ankra to fail to report the wet ramp and loading dock here. Accordingly, SCG contends, SCG's liability should be much less than WBB and Daley's.

The Court disagrees. First, the 22% figure arrived at by SCG contemplates what Mills would recover at trial. However, *Tech-Bilt* specifically contemplates that settlement are usually for far less than what may be recovered at trial. Thus, it is possible that Mills would recover double or even triple the $390,000 if he chooses to go to trial. The 22% recovered in settlement may very well be 50 or 60 percent of the total recovery sought if the case goes to trial. It is also possible that he may recover nothing or far less at trial. In any event, this is the risk and the benefit parties receive when they elect to settle. It is true that if the case proceeds to trial without WBB and Daley's as defendants, SCG and the USA may be liable for an amount in excess of the $390,000 already recovered. This, too, is SCG's risk in deciding not to settle. Moreover, if the case goes to trial, it is certainly plausible that a jury determines that Ankra's failure to warn of the hazard was unreasonable and apportions liability to SCG accordingly. *Tech-Bilt* contemplates that it is quite proper for settling defendants to pay less than their proportionate share of the anticipated damages; but that the "settlement not be grossly disproportionate to the settlor's fair share." *Abbott Ford, Inc. v. Superior Court*, 43 Cal.3d 858, 874-75 (1987). The Court finds that SCG has not met its burden of showing that recovery of nearly one-quarter of the total recovery sought via settlement from two of four tortfeasors is grossly disproportionate to its liability.

### 3. The USA's Objections

Citing *Far West Financial Corp. v. D & S Co.*, 46 Cal.3d 796, 815 (1988), the USA objects to the proposed settlement primarily on the grounds that it improperly extinguishes the USA's potential claim for equitable indemnity against WBB. In *Far West*, the court held that courts may consider indemnity relationships in their good faith analysis. *Id.* The USA's concern derives from the contract between WBB and the USA, which provides that WBB will name as an additional insured on those policies "the United States of America, acting by and through the General Services Administration." Tseng Decl., Ex. A. WBB provided the USA with a copy of its insurance policy with Arch Insurance,

9

which defines "Insured" to include a third party "whom you are performing operations when you are specifically required by a written construction contract or agreement with such person or organization to include them as an additional insured on your policy..." Tseng Decl. ¶ 6, Ex. E. WBB has not yet confirmed to the USA whether WBB properly added the USA as an additional insured under WBB's insurance policy with Arch Insurance. Nevertheless, citing this provision, the USA has tendered its defense to Arch Insurance, seeking to have Arch cover its costs in this case. The USA's concern, however, arises from the uncertainty over whether WBB *actually* named it as an additional insured. If Arch insurance rejects the USA's tender, or accepts it with a reservation of rights, and the USA is ultimately found liable at trial, the USA believes it would have a claim against WBB for equitable indemnification based on WBB's failure to wash and clean the ramp/loading dock in a proper manner. If the instant motion is granted, it would extinguish this hypothetical claim.

The USA's concern is misplaced. Here the moving defendants seek an order barring all claims "for contribution, or partial or comparative or equitable indemnity, ***based on comparative negligence or comparative fault***, arising out of the Plaintiffs' case..." (emphasis added). An action for equitable indemnity allows recovery by one defendant from another defendant who is both jointly and severally liable to plaintiff. *Li v. Yellow Cab Co.*, 13 Cal.3d 804 (1975). The hypothetical claim the USA has described is not based on equitable indemnity, but instead it is premised on a breach of contract theory – that WBB breached its agreement with the USA to name the USA as an additional insured under its policy with Arch Insurance. As the moving defendants assert, that hypothetical breach of contract claim has nothing to do with negligence or comparative fault and would not be barred by the good faith order sought here.

Assuming that WBB did in fact name the USA as an additional insured, and WBB's insurer Arch Insurance nonetheless denies the USA's tender for defense and indemnity, this too would not give rise to an equitable indemnity action between the USA and WBB. Instead, it would give the USA a cause of action against Arch Insurance. The decision to indemnify the USA and cover its defense does not

belong to WBB, it is Arch Insurance's alone. If Arch Insurance is contractually required to cover and defend, and refuses to do so, then the USA's dispute is with Arch, not WBB.

The USA argues, assuming Arch Insurance refuses to indemnify it, that it should be permitted to sue WBB for equitable indemnification based on WBB's failure to discharge its contractual duties to wash and clean the ramp and loading dock in a proper manner. If WBB did not perform its contractual duties in a reasonable manner – by not posting warning signs or properly hosing down the loading dock area – the USA would have a cause of action for implied contractual indemnity. *See Prince v. Pacific Gas & Elec. Co.*, 45 Cal.4th 1151,1157 (Cal. 2009). However, WBB's alleged deficient performance is wholly unrelated to the parties' dispute over whether WBB properly named the USA as an additional insured or whether Arch Insurance will tender and cover. Presumably, WBB had a duty to perform cleaning and wash downs according to its contract independent of whether it properly included the USA as an insured. Moreover, "implied contractual indemnity is but a form of equitable indemnity." *Id.* at 1119, n.2. And immunity from equitable indemnity claims is precisely the benefit California law provides for settling defendants. *See* Cal. Civ. Pro. § 877.6(c). The USA cannot escape this immunity by raising this additional insured issue.

Non-settling defendants run the risk that they may face greater liability at trial than they otherwise would have if they joined the settlement. Again, the only issue for the Court is whether this liability is grossly disproportionate. *Abbott Ford, Inc. v. Superior Court*, 43 Cal.3d , 858, 874-75 (1987). Here, plaintiffs allege that the USA is liable both as a joint tortfeasor for its actions in employing WBB, Daley's and SCG, and for its own actions. Plaintiffs allege that the USA failed to provide any written rules or regulations as to how to safely clean the loading dock area while at the same time, requiring parties to utilize only the loading dock area for pick ups and deliveries. Also, it is alleged that the ramp was too steep, that it was not flush with the top of the loading dock area which required Mills to awkwardly negotiate pushing the pallet over the lip of the ramp, that the ramp was too close to the wall, and that the ramp was slippery to begin with. All of this, independent of the joint tortfeasors' actions, may give rise to liability to the USA. In other words, it is alleged that the USA was

11

not merely vicariously liable, but also liable for its own negligence. Given the scope of the alleged liability, the Court finds that the USA has not met its burden of showing that recovery of nearly one-quarter of the total recovery sought via settlement from two of four tortfeasors is grossly disproportionate to the USA's own liability in this incident.

**4.     The *Tech-Bilt* Factors**

Although the Court has discussed these factors in addressing SCG and the USA's objections, the Court here explicitly finds that these factors counsel in favor of approving the proposed settlement.

      **a.     Rough approximation of the settlor's proportionate liability.**

As the moving defendants argue, there is no direct evidence that their actions caused Mills' injury. The only percipient witnesses, Ankra and Hernandez, never testified that they actually saw WBB or Daley's personnel washing the area. Mills himself was unclear in his testimony as to whether the accident was caused by: the slippery ramp for which there was no warning; the steep slope and his inability to negotiate the lip of the ramp which was not flush against the dock; the lack of brakes on the pallet; the close proximity of the ramp to the loading dock wall; or some combination of all these things. While there is circumstantial evidence that there was an expectation that WBB and Daley's would wash the area, and that they would put up warning signs when they did so – and that no signs were present – this does not conclusively establish that WBB and Daley's are significantly more at fault than the non-settling defendants. There is a significant causation issue here with respect to which of the joint tortfeasors primarily caused the slip and fall. Moreover, there is a comparative fault issue: there is evidence that Mills had a knee problem suggesting that he should not have been performing such heavy duty moving in the first place; and there is evidence that ABF was partly at fault for requiring Mills to use a non-motorized pallet jack with no brakes, for which Mills allegedly received inadequate training.

Given these facts, the Court finds that the proposed settlement roughly approximates WBB and Daley's proportion of potential liability.

### b.     The amount of the settlement.

To determine whether the proposed amount satisfied California's good faith requirement, the defendant's "good faith will not be determined by the proportion his settlement bears to the damages of the claimant. For damages are often speculative, and the probability of legal liability therefore is often uncertain or remote." *Stambaugh v. Superior Court*, 62 Cal.App.3d 231, 239 (1976). Rather, courts are to examine whether the settlement is grossly disproportionate to what a reasonable person at the time of settlement would estimate the settlor's liability to be. *City of Ground Terrace*, 192 Cal.App.3d 1251, 1262 (1987).

Here, according to moving defendants, Mills earned between $40,000 and $48,000 annually during his years as a truck driver at ABF, for an average monthly income of $3,666. Plaintiff has not worked since the December 2008 accident, except for a two month period where he attempted modified duties. Accordingly, moving defendants estimate that plaintiff has lost approximately $160,000 in income. Additionally, moving defendants note that approximately $120,000 in workers' compensation medical expenses have been paid on Mills' behalf. Moving defendants dispute that the entirety of this amount is due to the incident because of evidence that Mills had prior injuries and ongoing pain.

Given these facts, the Court finds that the settlement is reasonable, given Mills' current injuries and potential difficulties in attributing those injuries to moving defendants' negligence.

### c.     Settlor should pay less in settlement than at trial.

Although the USA and SCG dispute that they are primarily liable, the Court notes that this settlement was arrived at after significant discovery, depositions and negotiations between the parties. Having expended such time and money, the settling parties now seek to avoid continued expenses and a possible expensive trial. Accordingly, the Court finds the amount of the settlement reasonable, given the potential outcome at trial and the fact that settling-defendants are allowed to receive a significant discount by settling, rather than proceeding to trial.

**d.    The financial condition of the settling defendant and insurance policy limits.**

There is no evidence that any of the defendants would be unable to satisfy a judgment. WBB's insurance coverage was for $1,000,000, which is in excess of the settlement amount. Daley's insurance coverage is for $1,000,000, which is also in excess of the settlement amount. Accordingly, this factor counsels in favor of approving the proposed settlement.

**e.    Allocation of the settlement proceeds among the plaintiffs**.

WBB is paying $340,000 and Daley's is paying $50,000. Daley's is paying less because according to moving defendants, WBB was responsible for Daley's work. Plaintiff Mills is to receive the bulk, $282,500, while ABF is to receive $107,500. ABF originally sought $200,000 in damages for past and future workers' compensation costs. Moreover, should the remaining defendants go to trial against plaintiffs, the amount of the settlement would be an off-set. Given these facts, the Court finds that these allocations are reasonable.

**f.    Collusion, fraud or tortious conduct**.

*Tech-Bilt* instructs that courts are to consider the existence or absence of any collusion, fraud or tortious conduct aimed to injure the interests of any non-settling defendants. The facts presented show that the settlement here was reached through arms-length negotiations. The settlement occurred after an all day mediation session with a neutral mediator. The settlement amount of $390,000 contains no other consideration. Thus, the settlement appears to have been made in absence of collusion, fraud, or tortious conduct, and non-settling defendants make no allegations to the contrary. Accordingly, this factor counsels in favor of approving the proposed settlement.

In sum, application of the *Tech-Bilt* factors demonstrates that the proposed settlement is a good faith settlement under California law. Accordingly, the Court hereby bars any present or potential joint tortfeasor from bringing any future claims against the settling defendants for equitable contribution or partial or comparative indemnity based on comparative negligence or comparative fault.

**CONCLUSION**

For the foregoing reasons, and for good cause shown, the Court GRANTS West Bay Builder's and Daley's motion. The Court finds that the settlement agreement was entered by the parties in good faith, and bars any present or potential joint tortfeasor from bringing any future claims against the settling defendants for equitable contribution or partial or comparative indemnity based on comparative negligence or comparative fault.

**IT IS SO ORDERED.**

Dated: March 6 , 2013

SUSAN ILLSTON
United States District Judge